## THE GEVALIA and THE VISION.

(*District Court, S. D. New York.* May 20, 1889.)

1. STRANDING VESSELS—ANCHORS AND CABLES—FOULING.

Good seamanship requires that the inboard end of the anchor cable, if fastened, be lashed with ropes only, that may be cut at a moment's notice, and the anchor slipped when necessary

2. SAME.

The yachts G. and V. having anchored in Larchmont harbor, and a gale arising, during which both dragged their anchors, the G. got under way for another harbor, and in doing so crossed the line of the V.'s cables and fouled them with her starboard anchor, not yet hove aboard. On being hailed to slip the cable she was unable to do so, because the chain was shackled fast, and both vessels, through the fouling, shortly went ashore. *Held*, that the G. took the risk of crossing the V.'s cables, and of her inability to slip her cable at once, and was solely liable for the damages.

In Admiralty. Libel and cross-libel for damages.

*Shipman, Barlow, Larocque, & Choate,* for the Vision.

*Eugene L. Bushe,* for the Gevalia.

BROWN, J. On the evening of June 28, 1888, the yacht Vision anchored near the mouth of the harbor at Larchmont, Long Island sound, from 200 to 300 feet nearer the shore than the yacht Gevalia, previously at anchor there, and also a little to the northward of her. On the following day a gale arose, blowing from the east or south-east, causing the Vision to drag her two anchors. Signals of distress were set, and help was subsequently procured by borrowing two anchors and cables from other vessels. Her four cables ranged from 20 to 50 fathoms; one of the borrowed ones being partly of rope, next to the yacht. With these I find that she was held safely and securely, though quite near the shore, after having dragged several hundred feet. The Gevalia, which bore off the Vision's port bow, also dragged somewhat, and her master, not wishing to remain there over night, at about 5 P. M. got under way for the purpose of seeking another haven. He was obliged to start upon the port tack, and in getting under way the Gevalia drifted astern and to leeward, so as to cross the line of the Vision about 100 feet ahead of her, or less than half the length of her longer cables; so that the starboard anchor of the Gevalia, not yet being hove aboard, in crossing the Vision's cables fouled with some one of them, the result of which was that both vessels went ashore a few minutes afterwards, and sustained damages for which the above libel and cross-libel were filed.

I think the weight of evidence is that at the time the Gevalia got under way she was from 300 to 400 feet distant from the Vision, and off her port bow; that is, at least 300 feet abreast of her, and a little ahead. The evidence also is that when she reached the line of the Vision's cables, she had attained a speed of about six knots. I am not satisfied that at this speed, or about this speed, she could not then have come about and made a short tack, and afterwards resumed her port tack,

without crossing the line of the Vision's cables.    But, without regard to this question, I think she had no right to cross the cables of the Vision without taking the risk of her own anchor's fouling.    Her master well knew of these cables, and of their probable lengths, which were in fact about the same as his own.    He had seen additional cables brought to her aid during the day, and knew that she had drifted more than he. He knew that he would cross at half her cable's length or less.    No anchor buoys could therefore have given him more serviceable information than he already had.    When it was known that the anchor had fouled, because the Vision began to be hauled ahead in tow, the master of the latter hailed the Gevalia to let slip her anchor cable.    That could not be done, as the master of the Gevalia says, because it was shackled so fast to a beam in the hold that it afterwards took him two hours to unshackle it.    The necessity of letting anchor cables slip, and of being prepared for it upon emergencies like this, has been familiar to seamen from time immemorial.    It is the customary means of averting imminent danger after fouling.    To have a cable shackled so that it cannot be slipped at need is bad seamanship.    If lashed at all, it must be by a rope that can be cut at a moment's notice on emergency.    See Nares on Seamanship, (6th Ed.) 156.    The neglect of the Gevalia to have her cable in ship-shape order in this respect, was undoubtedly the ultimate cause of this collision, as the primary cause was her crossing the line of the yacht's cable before her starboard anchor was hove up; and for both she is responsible.    It is alleged as a fault against the Vision that she did not cut her cable when hailed to do so by the master of the Gevalia. But the storm was then at its height.    She was near the shore and had been obliged to borrow additional cables to hold her.    One of the short cables was cut for another reason, and the kedge cable parted.    She was under no obligation to the Gevalia to cut her own cables, and take the risk of speedily running ashore.    I do not see any fault in the Vision, and the result is that the Gevalia must be held alone answerable for the damages.    Decrees accordingly, with costs.